IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2008

**STATE OF TENNESSEE v. JOSEPH WAYNE GRAVES**

**Direct Appeal from the Circuit Court for Decatur County**
**No. 05-CR 219    C. Creed McGinley, Judge**

---

**No. W2007-02552-CCA-R3-CD  -  Filed October 13, 2009**

---

Following a jury trial, Defendant, Joseph Wayne Graves, was found guilty of aggravated assault, aggravated robbery, aggravated kidnapping, and theft of property valued at more than $500 but less than $1000.  The trial court imposed an effective sentence of sixty-three years.  On appeal, Defendant alleges:  (1) the trial court erred when it denied his motion to suppress evidence; (2) the evidence presented does not support his convictions; and (3) the trial court erred when it sentenced him.  After a careful review of the record and the applicable law, we affirm Graves' convictions; however, we conclude that double jeopardy protections require that the convictions for aggravated robbery, aggravated assault, and theft be merged.  Accordingly, we remand to the trial court for purposes of merger and for entry of corrected judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Guy T. Wilkinson, Camden, Tennessee, for the Defendant, Joseph Wayne Graves.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Sophia S. Lee, Assistant Attorney General; Hansel McCadams, District Attorney General; Jerry W. Wallace and Jennifer A. Hedge, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Background**

**A.  Suppression Hearing**

The trial court held a preliminary suppression hearing to determine whether to suppress the following evidence: a roll of money, a bloody knife, a bandana, and a towel.  At the hearing, Officer Mike Harralston of the Decatur County Sheriff's Department testified that he was dispatched to

investigate an "incident" on August 14, 2005. Officer Harralston said he went to Debra Phoenix's house to arrest Defendant. While there, he talked with Phoenix, who "indicate[d]" that she resided there, and she consented to a search of the premises. Officer Harralston said Phoenix verbally consented to a search that morning, and she later signed a written consent form. While searching the house, the police found money, a bandana, and a bloody knife. A pink towel was found in Defendant's pick-up truck, which was parked in the driveway of the house. After seeing the pink towel in the truck, the police took possession of the vehicle, and they later obtained a warrant to search the truck. Officer Harralston described the scene by saying, "Upon walking to the truck you could . . . see a pink towel laying in the seat that resembled – highly resembled to me the towel or a piece of the towel that resembled the bindings that were used to restrain . . . the victim." He said the police took custody of the towel with Phoenix's consent.

On cross-examination, Officer Harralston testified that Phoenix signed the written consent form to search her house at the Decatur County Sheriff's Department, as opposed to the Henderson County Sheriff's Department, even though her house was in Henderson County. Officer Harralston said that while at Phoenix's house between 5 and 7 A.M., he asked Defendant, who was not yet under arrest, to consent to a search. Defendant "would not say a word," and instead, "[h]e sat in the back [of the police cruiser] and smiled." Officer Harralston said he then asked Phoenix if she consented to a search, and she said, "'No problem.'" He said the police went into a room in the house that was in "severe disarray." In that room, "[t]here was a . . . blue and white bandana. There was a box on the headboard full of knives. And under the mattress of [Defendant] and Debra Phoenix, on the side that []Phoenix state[d] that [Defendant] sle[pt] on, approximately three inches under the mattress was a roll of money." Phoenix told Officer Harralston that she "ha[d] a lifetime dowry to that home and she live[d] there."

Concerning the truck, the police knew it was registered to the Defendant, but they searched it because "[Phoenix] gave consent to search her home and everything on her property." Through one of the truck's windows, an officer saw the pink towel along with a blue towel, a bag of pretzels, and a box of shotgun shells. Phoenix subsequently consented to a search of the truck.

Defendant testified that he had just taken a shower and was getting dressed when the police came into his bedroom at 4:30 A.M. Phoenix was still in her bedroom, and her fourteen-year-old son let the police into the house. Defendant stated that the police handcuffed him and put him immediately into the cruiser, where he was partially admonished of his *Miranda* rights and then driven to the Decatur County jail. Defendant maintained that he and Phoenix had separate bedrooms. He also stated that a woman named Betty Peterson owned the house, even though he had lived there for five years.

After hearing the evidence, the trial court denied the motion to suppress, and it allowed the evidence to be admitted at trial.

**B. Trial**

Doris Tharp testified that around midnight on August 13, 2005, she was attacked while closing her restaurant, the Oak Hill Café, for the night. Tharp said that, after locking the doors, she and her co-worker walked to the restaurant's parking lot. Her co-worker waited to leave the parking lot until after Tharp started her truck. Tharp said that, when she got to the main highway, she realized she had a flat tire. Consequently, she returned to the restaurant's parking lot and made phone calls for help. She was unable to reach anyone, and she decided that she would exit her truck to use the restaurant's bathroom. Tharp said she took her personal gun with her and walked to the door. She was beginning to unlock the door to the restaurant when, suddenly, "there was a shotgun in [her] face." Tharp recounted, "[A]s the shotgun got in my face [the man holding the gun] pumped it . . . He ejected . . . a shell." The man yelled at her to "throw [her] gun down" and threatened to "blow [her] head off." Tharp realized that the man had a sawed-off shotgun, and she placed her gun on the ground. Tharp said the man wore a blue and white bandana over his face and a black cap over his head. She could only see his eyes. The man ordered Tharp to walk and led her to her truck. At that point, they both got in her truck, and he directed her to drive towards Lexington, Tennessee. The man told her that he had two guns "on her." Eventually, they stopped driving, and the man made Tharp get out of the truck and lie on the ground on her stomach. Tharp related, "[H]e tied me up, you know, made me put my hands behind me." She added, "[A]t first he just tied my hands together and he put a knife up to my throat, you know. He shoved my head down in the ground, told me not to – not to look up. . . ." Tharp said she could feel the knife and she "was scared to death he was going to kill [her]." The man took her watch and money from her pockets. He also pilfered through the truck. Tharp said whenever she lifted her head he "shoved [her] head back into the ground."

At one point, the man then sat on Tharp's buttocks and reached around her body and placed his hands inside her clothing. She said he touched her on the front of her body in between her legs, and he "squeez[ed] [her] butt, touch[ed] [her] butt, and patt[ed] [her] on the butt." He also pulled her "up toward[s] him" while touching her. Tharp stated that, after this, her pants and underwear were torn. Before the man left, he tied her feet, and then he bound her hands and feet together with a belt. Tharp recounted, "[T]he last thing that he did, he came back over to me, you know, after he'd tied me up and stuff, and he put the . . . knife back upon my throat." He told her that, if she raised her head "within the next fifteen minutes," he would "cut [her] throat from ear to ear."

Tharp stated that, after she lay there for awhile, she eventually began trying to free herself. She said she did not know if fifteen minutes had passed, and she could not see him, but she decided to roll herself down the hill. Once down the hill, she crawled through the weeds until she came to someone's house. Tharp said the woman who lived in the first house would not help her, but the couple who lived in the second house let her inside to seek help.

After Tharp heard Defendant was the lead suspect for her case, she and her son went to Phoenix's house to see if she could find her keys in his truck. While there, Tharp's son found weapons in the bushes. Tharp said, "The shotgun and my gun w[ere] found right at the right side of [Phoenix's] house and under the bushes . . . ." On cross-examination, Tharp said the police returned around $900 to her. Tharp stated that she bought her gun from a man in Lexington,

3

Tennessee. When she tried to register it, the Sheriff would not help her because she had a beer license, but he did tell her to keep it near her when at the restaurant. Tharp said she did not know who attacked her because she only saw his "deep set dark eyes."

Officer Harralston testified that at around 2 A.M. on August 14, 2005, he was dispatched to Eddie Weatherford's residence. There, he saw the victim with "strips of a towel, a bath towel, tied around her wrists and one of her ankles. Her pants were torn. There was a belt in her lap." Officer Harralston said the towel was "light pink polka-dotted" with "some red threads on the border." He described the belt as braided. Officer Harralston stated, "[Tharp] had on a – like a lime green T-shirt. It had several seeds stuck to it. The crotch of her blue jeans was ripped, exposing her underwear." He said it "looked like she'd been rolling around in the weeds." Additionally, Tharp's shirt had blood on it. Officer Harralston said he went to Oak Hill Café, and he found a "spent twelve-gauge shotgun hull in the front parking lot." When he inspected Tharp's truck, he discovered that it had a "shredded front tire, like it had slits all in the sidewall." Tharp's purse and a black bag were both still in the truck.

Officer Harralston said he went to Phoenix's house, where Defendant was staying, and Phoenix consented to a search of her house. In the house, the police found a blue bandana, a black ball cap, a bloody knife, and a roll of money containing $999.00 under the Defendant's mattress. Some of the bills in the roll of money had blood on them. Additionally, the police found a pink towel, like the one used to bind the victim, in Defendant's truck. As for the guns used, the police found a sawed-off shotgun whose shells matched those of the one found at Oak Hill Café, and they found a .38 colt revolver in the bushes near Defendant's house. There was a box of shotgun shells in Defendant's truck of the same brand, size, and color as those within the shotgun and on the ground at Oak Hill Café. Officer Harralston said, when he tried questioning Defendant, Defendant asked for a lawyer.

On cross-examination, Officer Harralston said the shotgun was untraceable, and the revolver was not registered. He did not send either the guns or the knife for further analysis. He also admitted that he did not know for sure if the spots he saw on the money found under the mattress were blood. Officer Harralston stated that he found $229 in a deposit bag in the victim's truck.

Special Agent Donald Carmen with the Tennessee Bureau of Investigation ("TBI") testified that he specialized in microscopic examinations of firearms. He said the shotgun was manufactured by Stevens, and it was a pump-action gun. He said the safety feature on the gun did not function. He also matched the shotgun shells from the gun to the shell found in the Oak Hill Café parking lot. Finally, he stated that the gun's length made it a prohibited weapon under Tennessee law.

TBI fiber analyst Linda Littlejohn testified that she matched one of the towels on the victim to the towel in Defendant's truck. She said another piece of the towel she found on the victim did not conclusively match the towel found in the truck. On cross-examination, Agent Littlejohn explained that she could not piece the towel back together because of "the condition of the separations." She also said she did not test the towel for blood.

4

TBI agent Bradley Everett, a serology DNA expert, testified that the blood found on Tharp's tee-shirt matched Defendant's blood. On cross-examination, Agent Everett said he did not test all the blood spots.

Heather West, Tharp's granddaughter, testified that she saw Defendant at Oak Hill Café around 11:30 P.M. on August 13, 2005. She said he was "dressed in dark clothes, a shirt, [and] pants." He also wore "a bandana like a do-rag on his head with a cap over it." She described the bandana as being dark blue. West said Defendant was at the restaurant for only five to ten minutes.

Floyd Edward Weatherford testified that early August 14, 2005, he heard dogs barking and a knock at his door. He saw Tharp there, and she had "some things tied around her arms and her ankles and stuff, and she had grass and different things on her. . . ." He said he called the police for her.

Officer Jeremy Inman with the Decatur County Sheriff's Department said he fingerprinted Defendant, who had a cut on his right thumb, at the jail.

Mark Tolley, an officer with the Henderson County Sheriff's Department, testified that he went with another officer to find Defendant at Phoenix's house. He said he did not take any evidence himself, but he did see the money under the left side of Defendant's mattress and the guns propped against a tree outside. Tolley stated that Defendant normally dressed in boots, blue jeans, and a bandana on his head. On cross-examination, Tolley explained that he was involved with the case because Phoenix lived in Henderson County.

Debra Jean Phoenix testified that Defendant lived with her at the property her mother owned. She said that she usually went to bed around 10 P.M., and she did not know where Defendant was most of the time. She said Defendant owned several leather belts. Phoenix said the guns found were "on the other property next door," as opposed to on her property. She stated that the guns remained on her property until the police took possession of them.

On cross-examination, Phoenix said the Defendant was still awake when she went to bed on August 13, 2005. She testified that she was unaware anything had happened until the police came to her door early the next morning. Phoenix acknowledged that Defendant was married and that sometimes his wife would come and get him from the house; she did not know whether Defendant's wife came that night.

For the defense, Betty Jordan testified that she employed Defendant and a man named Arvie Wheat on August 14, 2005, to remove the roof and shingles from her house. She said Defendant cut his hand and kept a rag wrapped around his hand. Jordan recalled that the men reported for work at her house, but they left midday. Defendant and Wheat returned to the house around 10:30 or 11:30 A.M., and they began drinking. Consequently, Jordan made them leave her house. On cross-examination, Jordan said the men never finished the job.

5

Arvie Wheat testified that he and Defendant arrived at Jordan's house around 8 A.M. to help with the roof. Defendant cut his thumb around 10:30 A.M., and Jordan soon instructed them to leave because they were no longer working. Wheat said he and Defendant went to Oak Hill Café for a few beers, and they went in and out of the restaurant about four or five times. He described how they spent the day, "Yeah, [we would] go in and drink a beer, shoot a game of pool and then leave for a while and ride around, talk about a job." Wheat said that, while Defendant carried him home around 10 P.M., Defendant talked about planning to "pick up his wife and go camping out at the river."

On cross-examination, Wheat said the men took a six-pack of beer with them to work in the morning. He said they went to Oak Hill Café as soon as it opened. On redirect examination, Wheat testified that Defendant encountered Tharp at Oak Hill Café.

Sheila Camper Graves, Defendant's wife, testified that she had been married to Defendant for twenty-one years but "[h]ardly ever" lived with him. She acknowledged that he lived with Phoenix for a year-and-a-half or two years. Graves said she saw Defendant after 8 P.M. on the night in question in Parsons, Tennessee; she asked Defendant about Phoenix, at which point he laughed. Graves said Defendant was with Wheat, and the pair had been drinking all day. She said she "hounded" Defendant to take her fishing, which he agreed to do, and she picked him up after midnight at a location near Phoenix's house. Graves said they stopped at a place to get worms, and then they fished. While fishing, they talked about their relationship. She said she took Defendant back to Phoenix's house around 4:40 A.M. Graves said Defendant told her that he had been working at Jordan's house, but Graves said she was not sure if that was true. Defendant also told her that he and Wheat went to Oak Hill Café three to four times.

On cross-examination, Graves said she does not know what Defendant did about ninety percent of the time. She also said she did not know what he did the night of August 13, 2005.

James Dixon testified that he saw Graves and Defendant around midnight on August 14, 2005, when they obtained some fish bait from him.

Brenda Kay Walker testified that she knew Defendant and Phoenix. She said she went by their house around 10:30 or 11:30 P.M. on August 13, 2005, and she spoke with Defendant for about fifteen minutes.

After hearing the testimony, the jury convicted Defendant of aggravated assault, aggravated robbery, aggravated kidnapping, and theft of property valued at more than $500 but less than $1000. It is from these judgments that Defendant now appeals.

## C. Sentencing Hearing

At the sentencing hearing, the State entered a presentence report and the victim's impact statement. Defendant testified on his own behalf. He said that he had liver cancer, and he explained that he was under the influence of drugs when he committed the crimes. Defendant apologized for

his actions. On cross-examination, Defendant acknowledged that he has made "bad choices for many years." The trial court sentenced Defendant as a Range III, persistent offender to thirteen years on count one, twenty-five years on count two, and six years on count five. On count three, Defendant was sentenced to twenty-five years at one-hundred percent as a repeat violent offender. Counts one through three were ordered to be served consecutively to each other and concurrent to count five for an effective sentence of sixty-three years.

## II. Analysis

Defendant raises three issues on appeal: (1) the trial court erred when it denied his motion to suppress evidence; (2) the evidence presented does not support his convictions; and (3) the trial court erred when it sentenced him.

### A. Motion to Suppress

Defendant argues that the trial court erred when it denied his motion to suppress evidence gathered at Debra Phoenix's house. Specifically, Defendant argues that he did not consent to a search of his bedroom or his truck and that Phoenix lacked authority to consent to searches of those areas. The State argues that Phoenix had authority to consent to the search of the bedroom and that the police saw the towel in plain view in the truck, which then gave the police probable cause to search the truck.

When the trial court makes findings of fact at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App.1992). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility of witnesses, the weight and value of the evidence, and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. *Odom*, 928 S.W.2d at 23. The application of the law to the facts, however, requires *de novo* review. *State v. Daniel*, 12 S.W.3d 420, 423-24 (Tenn. 2000). Likewise, if the evidence does not involve a credibility assessment, the reviewing court must examine the record *de novo* without a presumption of correctness. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). Review is not limited to the record of the suppression hearing; rather, it extends to the entire record of proceedings. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

Under both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution, a warrantless search is presumed unreasonable. *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971)). The United States Supreme Court has carved out several exceptions to the warrant requirement based on the intrusiveness of the search, the individual's expectation of privacy, and the circumstances of the search. *State v. Jaime Lee Pittman*, No. 03C01-9701-CR-00013, 1998 WL

128801, at *3 (Tenn. Crim. App., at Knoxville, Mar. 24, 1998) (citing *State v. Nathaniel White*, No. 03C01-9408-CR-00277, 1995 WL 336977 (Tenn. Crim. App., at Knoxville, Jun. 7, 1995), *no Tenn. R. App. P. 11 application filed*), *no Tenn. R. App. P. 11 application filed*. If the State fails to satisfy its burden that a search was conducted pursuant to a recognized exception, the exclusionary rule may operate to bar the admissibility of any evidence obtained directly or derivatively from the unconstitutional search. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963); *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992).

One such exception to the search warrant requirement is if the search was conducted pursuant to consent. *Bartram*, 925 S.W.2d at 230 (citing *Schneckloth v. Bustamonte*, 412 U.S.218 (1973)). To quote *State v. Jackson*, "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993). The State has an initial burden of proving that the consent was freely and voluntarily given. *See State v. McMahan*, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). More specific to the issue raised by Defendant in this case, a third party's consent to search is valid where the third party had "common authority over [the] premises or effects . . . against the absent, non-consenting person with whom that authority is shared." *Bartram*, 925 S.W.2d at 230-31 (citing *U.S. v. Matlock*, 415 U.S. 164, 171 (1974)). Common authority is

> the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

*Id*. at 231 (quoting *Matlock*, 415 U.S. at 171, n.7). This Court has said that "a joint user has authority to consent to a search." *McGee v. State*, 451 S.W.2d 709, 712 (Tenn. Crim. App. 1969). Additionally, common authority may be established by showing that the facts available to the police officers would have given "'a man of reasonable caution . . . the belief that the consenting party had authority over the premises.'" *State v. Ellis*, 89 S.W.3d 584, 593 (Tenn. Crim. App. 2000) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990)).

We conclude that Debra Phoenix had authority to consent to the search of the bedroom in the house. To begin with, Phoenix and Officer Harralston testified that Phoenix readily consented to the police searching the house and premises that she occupied with Defendant. Phoenix described her ownership interest in the house as a "lifetime dowry." The trial court accredited the testimony of Officer Harralston, who said that Phoenix and Defendant shared a bedroom. It was within that bedroom that the police found the roll of money, the blue bandana, and the bloody knife. Phoenix demonstrated that she had mutual use of the property and, specifically, the bedroom. Moreover, Defendant had assumed the risk that Phoenix might permit the areas of joint access to be searched. *Bartram*, 925 S.W.2d at 31. In addition, the police had received facts, namely that Phoenix lived there permanently, that would have led a reasonable person to believe that Phoenix had authority

over the premises. Thus, we conclude that Phoenix had authority to consent to the search of the house and that the trial court properly allowed the fruits of that search to be admitted into evidence.

We next address the Defendant's claim that the police violated his Fourth Amendment right when they searched his truck without a warrant. The plain view doctrine is another exception to the search warrant requirement. *See Harris v. United States*, 390 U.S. 234, 236 (1968); *Armour v. Totty*, 486 S.W.2d 537, 540 (Tenn. 1972). The "plain view" doctrine requires proof that: (1) the objects seized were in plain view; (2) the viewer had a right to be in position for the view; and (3) the incriminating nature of the object was immediately apparent. *Horton v. California*, 496 U.S. 128, 136-41 (1990), overruling in part, *Coolidge v. New Hampshire*, 403 U.S. at 443; see also *Minnesota v. Dickerson*, 508 U.S. at 375.

We conclude that the circumstances surrounding the challenged search satisfy the plain view exception to the warrant requirement. Defendant challenges the admissibility of the pink towel found in his truck. The testimony offered shows that a police officer was walking past the truck when he looked in the truck window and saw the pink towel. The pink towel was similar in nature to the pink towel found tied around the victim's ankles and wrists. We conclude that the pink towel was seized within the plain view exception to the search warrant requirement. *See Pittman*, 1998 WL 128801, at *4 (holding that police seeing barrel of a weapon sticking out from under a car seat after looking through window had probable cause to search car). The evidence presented in the record does not preponderate against the trial court's findings, and Defendant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

Defendant argues that the evidence presented is not sufficient to support his convictions for aggravated assault, aggravated robbery, aggravated kidnapping, and theft. The State disagrees.

In reviewing Defendant's challenge to the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). Defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

In the indictment, the State charged that Defendant's use of a sawed-off shotgun against the victim constituted aggravated assault. The Tennessee Code Annotated defines aggravated assault as the intentional or knowing commission of an assault accompanied by the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(B) (2006). An assault is defined as when a person "[i]ntentionally, knowingly[,] or recklessly causes bodily injury to another; [] [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or [] [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." T.C.A. § 39-13-101(a) (2006). In this case, Defendant held the victim at gunpoint with his sawed-off shotgun. He pumped the shotgun while it was aimed at the victim, and he told her that he was going to "blow [her] head off." This evidence supports a finding that Defendant intentionally caused another person to reasonably fear imminent bodily injury and that he used a deadly weapon when eliciting such fear. We conclude there is sufficient evidence for Defendant's conviction of aggravated assault.

According to the indictment, Defendant's use of a sawed-off shotgun while he took money from the victim constituted aggravated robbery. Aggravated robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" while the perpetrator uses a "deadly weapon or []display[s] [such an] article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-401, -402 (2006). In this case, Defendant took money from the victim's pockets after he tied her hands and feet and made her lay on the ground. In addition, he used his sawed-off shotgun to threaten her by telling her that he had two guns "on her" and that he would "blow [her] brains out." These facts show that Defendant intentionally took property from another person by using a deadly weapon to put that person in fear. There is sufficient evidence to support Defendant's conviction for aggravated robbery.

The indictment for aggravated kidnapping charges that Defendant kidnapped the victim by using his sawed-off shotgun. Aggravated kidnapping is statutorily defined as the commission of false imprisonment while "the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(a)(5) (2006). False imprisonment is when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a) (2006). Specific to this case, Defendant, using his sawed-off shotgun, ordered the victim to walk from her restaurant to her truck and then to drive towards Lexington, Tennessee. While driving, he reminded her that he had two guns "on her." After they stopped driving, Defendant ordered the victim out of the truck and onto the ground, where he tied her hands and feet. These facts show that Defendant used a deadly weapon while he knowingly removed the victim in such a manner that substantially interfered with her liberty. We conclude that this is sufficient to support his conviction of aggravated kidnapping.

For the Defendant's fourth conviction, theft of property, Defendant was indicted for unlawfully taking more than $1000 but less than $10,000 from the victim. The jury convicted Defendant of the lesser-included offense of taking more than $500 but less than $1000 from the victim. Theft is statutorily defined as when a person, "with intent to deprive the owner of property . . . knowingly obtains or exercises control over the property without the owner's effective consent."

10

T.C.A. § 39-14-103 (2006). The victim testified that the Defendant took an unknown amount of money directly from her pocket. She also said that he threatened to shoot her if she looked up while he pilfered through her truck for money. The next day, the police found a roll of $999 under the Defendant's mattress. This evidence shows that Defendant knowingly obtained property without the owner's consent and that the value of the property was more than $500 but less than $1000. The evidence is sufficient to support Defendant's conviction of theft of property. Defendant is not entitled to relief on this issue.

Although not raised by either party, we are constrained to note that separate convictions for aggravated robbery, aggravated assault, and theft are barred by double jeopardy principles. Multiple convictions for the same offense violate constitutional prohibitions against double jeopardy. *See* U.S. Const. Amend. V; Tenn. Const. Art. 1, § 10; *see also State v. Denton*, 938 S.W.2d 373, 378-83 (Tenn. 1996). Under both the federal and state double jeopardy provisions, a defendant cannot be convicted of two offenses if one offense is a lesser of the other, and the same facts are used to establish the offenses. *See State v. Hayes*, 7 S.W.3d 52, 56 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 189 (Tenn. Crim. App. 1997). This Court has held that both aggravated assault and theft are lesser-included offenses of aggravated robbery. *Hayes, supra; State v. Franklin*, 130 S.W.3d 789, 798 (Tenn. Crim. App. 2003). In the present case, the three charges clearly relate to the fact that Defendant used a sawed-off shotgun in committing the offenses. Therefore, the findings of guilty on the aggravated assault and theft counts should be merged into the judgment of conviction for aggravated robbery. *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). "Merger avoids a double jeopardy problem while protecting the jury's findings." *State v. Reagan*, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588, at *20 (Tenn. Crim. App., at Nashville, May 19, 2004).

We therefore set aside the convictions for aggravated assault and theft and remand this case to the trial court for entry of corrected judgments to reflect the merger of Defendant's convictions for aggravated assault and theft into his conviction for aggravated robbery.

### C. Sentencing

Defendant argues that the trial court erred when it sentenced him. Specifically, he claims that the trial court wrongly applied an enhancement factor that addressed his previous criminal convictions, that the trial court did not give proper weight to his remorse and that he committed these crimes while on drugs, and that the trial court erroneously ordered his sentenced to be served consecutively after finding him to be a dangerous offender.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401 (2006), Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is

conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo*. *Carter*, 254 S.W.3d at 345 (citing *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 2002); *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c) (2006). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.*

In conducting a *de novo* review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing, (b) the presentence report, (c) the principles of sentencing and arguments as to sentencing alternatives, (d) the nature and characteristics of the criminal conduct involved, (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114, (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee's sentencing practices for similar offenses, and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b) (2006); *see also* Carter, 254 S.W.3d at 343; *State v. Imfield*, 70 S.W.3d 698, 704 (Tenn. 2002). Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. T.C.A. § 40-35-103(2), (4) (2006). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

When the trial court sentenced Defendant, it found that he had more than five felonies within the same conviction class as the current conviction or within any class above or within two classes below the class of the current conviction. The trial court went through each count of Defendant's convictions and determined the number of Defendant's prior convictions that applied to set the appropriate offender status for that count. On all counts, the trial court found Defendant to be a persistent offender.

The trial court then found the use of a deadly weapon to apply only to the theft conviction. It applied the enhancement factor of Defendant's prior convictions, excluding the convictions necessary to classify Defendant as a persistent offender. The court then enunciated its ruling for the first three counts:

The applicable range for Aggravated Assault in Count 1 would be three (3) to fifteen (15) years; as a Persistent Offender it would be ten (10) to fifteen (15) years. The Court finds that by applying an enhancing factor in looking at it, the appropriate sentence would be thirteen (13) years on that one. Also, because it is a Persistent Offender that would be forty-five percent (45%) as a classification.

Count 2, the Aggravated Robbery that he has been convicted of, the complete range would be eight (8) to thirty (30). The applicable range on this one would be twenty (20) to thirty (30) at forty-five percent (45%). The one enhancing factor of criminal history in that case would be twenty-five years.

Count 3, Aggravated Kidnapping would be eight (8) to thirty (30). You've got twenty (20) to thirty (30) as a Persistent Offender. The enhancing factor of the criminal history would be twenty-five (25) years would be the Court's sentence in that's forty-five percent (45%) classification.

The trial court then ordered Defendant to serve six years on the theft count: "Count 5, the Theft, like I say, you've got a deadly weapon on that, as well as the prior history. The complete range of one (1) to six (6), the viable range for him is four (4) to six (6). It is appropriate for a six (6) year sentence."

After it ordered the lengths of Defendant's individual sentences, the trial court addressed whether to order Defendant to serve his sentences consecutively or concurrently. The trial court found factor (2), that Defendant has an extensive record of criminal history, applicable. *See* T.C.A. § 40-35-115(2) (2006). It also found Defendant to be a dangerous offender, even after acknowledging Defendant's remorse. *See* T.C.A. § 40-35-115(4) (2006). The trial court said, "In this case, although he's expressed contrition here today and says that drugs were what caused it, there is no question that he is a dangerous offender under the laws of the State of Tennessee." Consequently, the trial court ran the sentences for counts 1, 2, and 3 consecutively; and, it ran the sentence for count 5 concurrent to counts 1, 2, and 3. The trial court said, "[t]he Court finds that the length of the sentence when you make these consecutive that they are reasonably, [sic] related to the extensive and severe nature of the acts that occurred here."

Because we have determined that the trial court should have merged Defendant's convictions for aggravated assault and theft into his conviction for aggravated robbery, we need only address the sentences for the aggravated robbery and aggravated kidnapping. On review, we conclude that the trial court properly sentenced Defendant. As the trial court stated, Defendant is a persistent offender. After determining Defendant's range, the trial court ordered specific sentences for each count. The trial court correctly sentenced Defendant within the statutory sentencing range for each conviction. It also correctly considered Defendant's prior convictions because Defendant had more convictions than those necessary to establish him as a persistent offender.

13

We also conclude that the trial court did not err when it ordered the manner of Defendant's service of his sentences. The trial court ordered the sentences for aggravated robbery and aggravated kidnapping to be served consecutively. When the trial court ordered the consecutive sentences, it cited its finding by a preponderance of the evidence that Defendant had an extensive criminal record and that he was a dangerous offender whose behavior indicated little or no regard for human life. *See* T.C.A. §40-35-115(2), (4) (2006).

Tennessee Code Annotated provides that a court may order a defendant's multiple sentences to run consecutively if the court finds by a preponderance of the evidence that the defendant is "an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(2). In this case, Defendant has a criminal record that reaches back to 1980. In addition to the felonies listed previously, Defendant has also been convicted of numerous misdemeanors including, but not limited to, traffic offenses, possessing narcotic equipment, vandalism, escape from jail, and criminal trespassing. This record shows a pattern of criminal behavior lasting for several decades. We conclude that Defendant has an extensive record of criminal activity and that the trial court correctly ordered consecutive sentences.

While the trial court need only rely on one factor when ordering consecutive sentences, the trial court in this case also concluded that Defendant is a dangerous offender. Under Tennessee Code Annotated section 40-35-115(b)(4), a court may impose consecutive sentences when: (1) the defendant is convicted of more than one offense; and (2) the trial court finds by a preponderance of the evidence that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." "Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995). Once a court has determined that a defendant is a dangerous offender, it must also determine that an "extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939.

Although the trial court did not mention the public protection aspect of *Wilkerson*, any error in that regard is clearly harmless. We conclude, as did the trial court, that Defendant is a dangerous offender and had no regard and no hesitation about committing a crime where the risk to human life was high. Defendant used a sawed-off shotgun and a large hunting knife to frighten the victim into complying with his demands. As Defendant kidnapped, assaulted, and robbed the victim, he continuously threatened to kill her. In addition, we conclude that an extended sentence is necessary to protect against further criminal conduct by Defendant due to the particularly predatory nature of Defendant's conduct. Finally, we find that the consecutive nature of the sentences relates to the severity of the particular offenses committed by Defendant. In addition to threatening to kill the victim, Defendant left her tied up in a hidden area and groped her in a sexually assaultive manner.

Defendant argues that the trial court did not give sufficient weight to his remorse when considering his sentences. However, the trial court did note Defendant's contrition when considering the issue of consecutive sentences. Defendant has not overcome the presumption of correctness with respect to the trial court's application of the relevant sentencing factors. *See* T.C.A. § 40-35-401(d); *see also Carter*, 254 S.W.3d at 344-345. We conclude that consecutive sentences were propr in this case. Defendant is not entitled to relief on this issue.

## CONCLUSION

After carefully reviewing the record and the applicable law, we conclude that the trial court properly denied Defendant's motion to suppress and that the evidence presented was sufficient for Defendant's convictions. However, we conclude that Defendant's convictions for aggravated assault and theft should be merged into his conviction for aggravated robbery. We therefore remand this case to the trial court for entry of corrected judgments to reflect the merger of convictions into a single judgment consistent with this opinion.

_____
THOMAS T. WOODALL, JUDGE